UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>Scene One Entertainment, LLC, f/k/a Bow Tie Management LLC, *et al,*[1]<br><br>Debtors. | Chapter 11<br>Case No. 26-11388<br>Lead Case<br>Joint Administration Being Requested<br>Case No. 26-11389<br>Case No. 26-11390<br>Case No. 26-11391<br>Case No. 26-11392<br>Case No. 26-11393<br>Case No. 26-11394<br>Case No. 26-11395<br>Case No. 26-11396<br>Case No. 26-11397 |

**DECLARATION OF JOSEPH MASHER**
**IN SUPPORT OF FIRST DAY RELIEF AND PETITION**

I, Joseph Masher, hereby declare the following under penalty of perjury:

1. I am the Managing Member of Scene One Entertainment, LLC f/k/a Bow Tie Management LLC ("Scene One"); BTC Schenectady, LLC ("BTC Schenectady"); BTC Theater Management, LLC ("BTC Theater"); Scene One Entertainment Parks, LLC ("Parks"); Scene One Gilford, LLC ("Gilford"); Scene One Greenville, LLC ("Greenville"); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas ("Market Arcade"); Scene One New Canaan, LLC

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, and each Debtor's case numbers are: Scene One Entertainment, LLC f/k/a Bow Tie Management LLC (9730, case no. 26-11388); BTC Schenectady, LLC (8547, case no. 26-11389); BTC Theater Management, LLC (7543, case no. 26-11390); Scene One Entertainment Parks, LLC (7786, case no. 26-11391); Scene One Gilford, LLC (9730*, case no. 26-11392); Scene One Greenville, LLC (2654, case no. 26-11393); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas (6830, case no. 26-11394); Scene One New Canaan, LLC (3947, case no. 26-11395); Scene One Spectrum, LLC (1526, case no. 26-11396); and Scene One Wilton, LLC (3876, case no. 26-11397).

*Upon information and belief, Scene One Gilford operated for approximately two years as a d/b/a of Scene One Entertainment, LLC. Scene One Gilford, LLC was formed on or around March 3, 2026. Debtors do not believe a separate EIN was ever procured for Scene One Gilford, LLC.

("New Canaan"); Scene One Spectrum, LLC ("Spectrum"); and Scene One Wilton, LLC ("Wilton") (collectively, the "Debtors") in the above-captioned proceeding and am fully authorized to act on behalf of the Debtors.

2. The Debtor, Scene One, is the principal operating company for numerous subsidiaries discussed herein which each operate individual theaters and in New York, Colorado, and Connecticut.

3. The Debtor, BTC Schenectady, was formed on April 18, 2007 as a subsidiary of Scene One and operates a theater commonly known as Scene One Movieland located at 400 State Street, Schenectady, NY 12305.

4. The Debtor, Parks, was formed on September 18, 2023 as a subsidiary of Scene One and operated an outdoor amusement park formerly known as both Huck Finn's Playland and Hoffman's Playland, located at 25 Erie Blvd., Albany, New York 12204.

5. The Debtor, Gilford, was formed on March 3, 2026 as a subsidiary of Scene One and operates a theater commonly known as Gilford Cinemas 8 located at 9 Old Lake Shore Road, Gilford, NH 03249.

6. The Debtor, Greenville, was formed on March 26, 2026 as a subsidiary of Scene One and operates a theater commonly known as Scene One Greenville Drive-In located at 10700 State Route 32, Greenville, NY 12083.

7. The Debtor, Market Arcade, was formed on March 05, 2026 as a subsidiary of Scene One and operates a theater commonly known as Scene One Market Arcade Cinemas located at 639 Main Street, Buffalo, NY 14203.

8. The Debtor, New Canaan, was formed on February 06, 2026 as a subsidiary of Scene One and operates a theater commonly known as Scene One New Canaan Playhouse located at 93

Elm Street, New Canaan, CT 06840.

9. The Debtor, Spectrum, was formed on March 20, 2024 as a subsidiary of Scene One and operates a theater commonly known as Scene One Spectrum 8 Theatres located at 290 Delaware Avenue, Albany, NY 12309.

10. The Debtor, Wilton, was formed on December 20, 2023 as a subsidiary of Scene One and operates a theater commonly known as Scene One Wilton Mall Cinemas & The Big Scene located at 3065 State Route 50, Saratoga Springs, NY 12866.

11. The Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of Tile 11 of the United States Code (hereinafter the "Bankruptcy Code") on November 22, 2026.

12. I submit this declaration to assist this Court and the parties-in-interest in understanding: (a) the circumstances leading to the commencement of these Chapter 11 cases; (b) the business structure of the Debtors; and (c) the Debtors' prepetition debt.

13. Additionally, I submit this declaration in support of: (a) the Debtors' petitions for relief under the United States Bankruptcy Code; and (b) the "first day" relief the Debtors have requested pursuant to the motions and applications also filed on the date hereof.

14. Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge as the Managing Member of the Scene One and all subsidiaries identified above.

## Background

### A. Personal Background

15. I started projecting movies at a small family theater in Vermont at the age of 11.

16. In the early 1980s I began working for Loews Cineplex at the Movie Theater located at the former Mohawk Mall in Schenectady, New York.

17. At the age of 17, I was transferred to the Loews Cineplex Cinema 7 in Latham New York as a general manager.

18. In 1990, I was promoted with Loews Cineplex and transferred to Binghamton, New York as the City Manager responsible for nine locations in the Southern Tier New York.

19. In 1994, I was transferred by Loews to Manhattan to open what became the world's busiest movie theater in Lincoln Square.

20. Subsequent to that, I joined Clearview Cinemas in 2000 as their Division Manager responsible for thirty eight locations in the greater New York City metropolitan region.

21. In 2004 I joined Bow Tie Cinemas which at the time was the oldest family-owned cinema company in the United States as the Chief Operating Officer.

22. During my tenure we grew from two locations to sixty one across six States.

23. I remained at Bow Tie until 2022, at which point, ownership began selling off and closing locations.

24. In August of 2022, myself and two business partners formed a management company (Bow Tie Management LLC) to manage the remaining twelve locations. I was a one-third partner in that endeavor.

25. In August of 2023, I bought my partners out, became the sole owner, and changed the name to Scene One Entertainment, LLC.

26. I have been the President of New York Cinema United (formerly known as the National Association of Theater Owners of New York) since 2013.

27. I currently sit on the Library of Congress Film Preservation Board and have served on same for approximately five years. That tenure ends this year.

28. I also sit on the board of the Entertainment Food and Beverage Association.

29. I am the immediate past treasurer of the National Body of Cinema United where I lead the finances of that organization through the COVID-19 pandemic and the subsequent reopening of Cinemas post-pandemic.

30. I am the immediate past president of the Theater Historical Society of America.

31. I have served as an expert speaker to Hollywood executives relating to the health, future, and growth of the cinema industry.

32. I have over 45-years of experience in the cinema industry. It is my passion and I cannot imagine doing anything else.

**B. Corporate Background**

33. The Debtors and the dates of founding and locations of operation are stated above.

34. The Debtors represent, collectively, one of the largest privately held American movie theater chains in the country.

35. Currently, the Debtors operate and/or manage theater locations across three states: New York, Connecticut, and Colorado.

36. The Debtors, and I personally, maintain strong licensing and vendor relationships with various companies which provide films, live entertainment, concessions, maintenance, utilities, security, and all other requirements expected of a theater meant to delivery an experience that will be fondly remembered to a diverse and continually returning audience.

37. As of the Petition date, the Debtors employ approximately (140) employees, paid in a mix of salary and hourly wages.

a. At the corporate level, there are two (2) salaried employees.

b. At the individual location level, managers and several assistant managers are paid

salary (approximately 8 employees) are salaried.

c. At the individual location level, the remaining employees are paid hourly (approximately 130 employees).

d. I do not take a salary, but rather, take distributions, when able, at an average rate of $15,000.00 per month.

38. Debtors anticipate needing to maintain their workforce through the life of the Chapter 11 proceeding. This workforce, including myself, engages in ticket sales, concessions sales, building cleaning and oversight, and management required to keep theaters in full and ready operation in an incredibly competitive field. Without the employees and the efforts which they exert in the support of operations, the Debtors would be wholly infeasible for the needs of this Chapter 11.

39. The Debtor's revenue is mostly derived from the sale of movie tickets, concessions, merchandise, and live entertainment.

40. Debtor also realizes revenues from ongoing management agreements at two locations (currently, Aspen, CO and New York, NY).

41. Debtor also realizes revenues from certain vendor rebates, such as food and beverage rebates from Coca Cola.

42. As of the Petition Date, the Debtors' combined assets aggregate approximately $1,200,000.00, including approximately $200,000.00 in equipment (projectors, screens, and sound equipment) and $1,000,000.00 in cash and receivables owed to Debtors.

43. The Debtors' combined liabilities are approximately $485,000.00 in priority unsecured debt, including certain taxes (approximately $5,000), wages (approximately $80,000.00), and advances from our Payroll Vendor (approximately $400,000.00) and $6,810,000.00 in general unsecured debt.

44. Of the identified general unsecured debt, $4,225,000.00 owing to 8 creditors is disputed.[2]

45. Based on the financial history of the Debtors, should this Court agree that the MCA amounts are not owed by Debtors', Debtors are confidently optimistic that they can fund a 100% plan back to their legitimate creditors

**Events Leading up to Chapter 11**

46. In or around September 2026, the Debtors consulted with Boyle Legal, LLC ("Boyle") to assess their financial situation and make a recommendation as to whether filing for bankruptcy protection would be in the best interest of the Debtor and their creditors.

47. Ultimately, Boyle and the Debtors' management determined that seeking protection under Chapter 11 of the Bankruptcy Code would be the best means for the Debtors to obtain relief from their numerous debts and allow them to successfully restructure the business debt payments.

48. The Debtors then retained Boyle in November 2026 for this instant filing and Petition.

49. Debtors currently manage and operate six (6) theaters across three states within the US.

50. Debtors were approached with the opportunity to purchase the building commonly known as 290 Delaware Avenue, Albany, NY 12209 (the "Spectrum" Theater), in December, 2025, when its commercial landlord provided a binding offer by an outside buyer, triggering Debtors to exercise their right of first refusal contained within its commercial rental contract.

51. This transaction required a $650,000.00 downpayment and the owner held paper (financing) for the remaining purchase amount. Debtors, not wanting to lose one of its preeminent

---

[2] All of Debtors' disputed Debt in the Debtors' Petition arises from certain "Merchant Cash Advance" Agreements entered into by the Debtors. Additionally, based on Debtor's internal accountings, Debtors have repaid these MCAs an aggregate of $5,500,000.00 against approximately $1,000,000.00 received by the Debtors.

locations, exercised its right of first refusal to purchase the Spectrum location.[3]

52. Additionally, Debtors opened new locations in New Caanan, Connecticut at the end of March, 2026; in Buffalo, New York in April, 2026; and in Greenvile, New York in May, 2026.

53. Based on a combination of the downpayment plus the expansion into three new markets, Debtor found itself in a cash crunch[4]

54. In order to continue operations while new locations came up to speed and ensure proper compensation of all contract obligations and employees, the Debtors ultimately sought alternative funding sources and found numerous companies willing to extend Merchant Cash Advance agreements ("MCA").

55. Over a period of multiple months, the Debtors worked to meet the daily repayments demanded by such MCAs which had filed UCC-1 statements against all assets, earnings, and inventory of Debtors despite the contracts stating that it would merely purchase expected future revenue.

56. The Debtors soon found that the weight of the daily repayments were insurmountable and defaulted on such MCAs.

57. Concerned about the prospects of maintaining these ongoing MCA payments, debtors retained the legal and professional services of Debt Consultants Group LLC ("DCG") out of Miami, Florida to serve as a debt reconsolidation and repayment company, whereby Debtors would pay weekly $189,000.00 for a period of 12-weeks and DCG would utilize said funds to satisfy their fees and contemporaneously settle the debts with outstanding MCAs in lieu of legal

---

[3] At the time of the purchase of the Spectrum Theater, Debtors had approximately $1,000,000.00 in cash reserves on hand.

[4] At the beginning of January 2026, Debtor had approximately $1,000,000.00 in cash reserves.

proceedings and judgment enforcement actions.

58. DCG advised Debtors to default on the MCAs and, in lieu of contractual payments, to pay DCG the consolidated amount of $189,000.00 per week.

59. DCG assured Debtors that $189,000.00 per week over a 12-week period would provide enough money to satisfy and settle of Debtors' outstanding MCA loans.

60. By week 7 of that agreement, DCG came back to Debtors and changed their tune. At that point they indicated that the amounts paid and the timeline proposed would not satisfy the MCA loans and then suggested that the repayment terms would need to extend to 37-weeks for some of the MCA entities and 57-weeks for others.

61. As the Debtors found themselves paying such an exorbitant amount each week with no apparent end in sight, Debtors articulated to DCG that it was unable to sustain the payment structure DCG promised would solve these issues.

62. Upon DCG learning that Debtors were no longer willing to able to fund $189,000.00 per week, DCG terminated their services and alerted Debtors' MCAs that they were no longer representing the Debtors and that any interested parties could seek proceedings for judgment and recovery.

63. After making good faith efforts to repay creditors and finding the current debt load leaving that endeavor impossible, Debtors now seek to file bankruptcy under Chapter 11.

64. Debtors goals in this bankruptcy are to maintain necessary workforce, licenses, contracts, and assets, restructure and repay valid debt, dispute usurious debts of MCAs, and maintain ongoing operations in order to be sustainably cashflow positive and survive the restructuring process.

65. Debtors believe based on their current workload, that it can successfully restructure; however, Debtor requires immediate bankruptcy relief in order to keep its creditors at bay while it formulates a plan of reorganization.

66. Annexed hereto and made a part hereof as Exhibit "A" is a true and accurate copy of a 13-week cashflow budget prepared by Debtor in Contemplation of this filing.

**First Day Motions**

67. **Motion of Debtor for Entry of an Order Authorizing Continued Use of Existing Bank Accounts**

a. In the ordinary course of business, Debtors maintain their business bank accounts with TD Bank, N.A.; NBT Bank, N.A.; Broadview Federal Credit Union; Alpine Bank, N.A.; Bank of America; and Bank of New Hampshire (collectively, the "Bank Accounts").

b. I understand that upon the filing of a petition for relief, the Debtors-in-Possession traditionally establish all new Debtor-in-Possession bank accounts.

c. I would respectfully request the Court allow the Debtors to maintain all of its pre-petition accounts for an interim basis of at least 60-days in order to establish new, post-petition DIP accounts and transfer depository and payment processing agreements over to the new accounts. Debtors, as discussed more fully below, would request certain pre-petition accounts be allowed, subject to the naming conventions of the United States Trustee, to remain open post-petition and serve as "sweep" accounts based on Debtors' collective business model.

d. Debtor intends on closing the following accounts with the following institutions as

soon as possible:

a. Bank of New Hampshire. Debtor, Guilford, is no longer operating and, as such, Debtors have no need for continued use of Bank of New Hampshire.

b. Broadview Federal Credit Union. Debtors established this account on advice of Debt Consultants Group (discussed *supra*). Post-filing, Debtors have no need for the continued use of this account and will consolidate cash held there under post-petition established DIP Accounts.

e. Debtors utilize the following institutions as "cash deposit accounts" for several of its locations:

a. Bank of America: Serves as Debtor, New Caanan's, cash depository account for any cash received by the business. Bank of America is located within the immediate vicinity of the New Caanan location and is the most conveniently located banking institution relative to the New Caanan location.

b. NBT Bank: Serves as Debtors, Market Arcade, Spectrum, Schenectady, Wilton, Parks, and Greenville cash depository accounts. NBT Bank is located within the immediate vicinity of these locations and is the most conveniently located banking institution relative to these locations.

c. Alpine Bank: Serves as Debtor, Management's, cash depository account for Debtors' Aspen, Colorado location.

f. TD Bank serves as Debtors' primary operating bank and, Debtor intends on establishing post-petition DIP accounts directly with TD Bank, and consolidating its DIP accounts under TD Bank in three main categories: (a) Operating; (b) Tax; (c)

Payroll; and (d) Managed Locations.

g. The debtors are licensed with over 20 film distribution studios, various concession companies, and other significant ongoing concern vendors which would see immediate interruption and possible temporary loss of services should the current Bank Accounts be closed.

h. Debtors propose to maintain all of their pre-petition Bank Accounts for a short period of time post-petition in order to avoid cash flow interruptions at this critical juncture.

i. Debtors fear that interruption of this *status quo* will result in irreparable harm to the Debtors and its ability to maintain ongoing operations.

j. Debtors do intend and will establish DIP accounts with approved UST depositories and propose ustilizing the current accounts as sweep accounts while it establishes post-petition DIP accounts pursuant to the UST's Operating Guidelines.

k. Debtors request the following pre-petition accounts be allowed to remain open, post-petition on a final basis:

a. Alpine Bank: Serves as Debtor, Management's, cash depository account for Debtors' Aspen, Colorado location. Debtors have no reasonable expectation that the amounts held in Alpine will ever exceed the FDIC insured limit of $250,000.00 and, given the proximity of Alpine to Debtors' managed location in Aspen, Colorado, is the easiest bank to ensure timely cash deposits from that location. Debtors' would utilize this account as a cash sweep account and on a periodic basis, transfer monies from Alpine to its TD Bank "Managed Location" account.

b. Bank of America: Serves as Debtor, New Caanan's, cash depository account for any cash received by the business. Bank of America is located within the immediate vicinity of the New Caanan location and is the most conveniently located banking institution relative to the New Caanan location. Debtors have no reasonable expectation that the amounts held in Bank of America will ever exceed the FDIC insured limit of $250,000.00 and, given the proximity of Alpine to Debtors' managed location in Aspen, is the easiest bank to ensure timely cash deposits from that location. Debtors' would utilize this account as a cash sweep account and on a periodic basis, transfer monies from Bank of America to its TD Bank "Operating" account.

c. NBT Bank: Serves as Debtors, Market Arcade, Spectrum, Schenectady, Wilton, Parks, and Greenville cash depository accounts. NBT Bank is located within the immediate vicinity of these locations and is the most conveniently located banking institution relative to these locations. Debtors have no reasonable expectation that the amounts held in NBT will ever exceed the FDIC insured limit of $250,000.00 (the amounts held, rarely exceed $20,000.00 and are swept weekly), given the proximity of NBT to Debtors' managed locations, is the easiest bank to ensure timely cash deposits from that location. Debtors' would utilize this account as a cash sweep account and on a periodic basis, transfer monies from NBT to its TD Bank "Operating" account.

l. Debtors respectfully suggest that the suggested maintenance of its Bank Accounts, as proposed, above, is in the best interest of the Debtor and the Bankruptcy Estate.

Forcing Debtors to relocate its cash deposit accounts to other depositories would increase overhead to the Estate as it would likely require Debtors to utilize armored vehicle services, such as Brinks, to transport money each day to another depository, whereas the location management currently have close and immediate access to the depositories outlined above and can do so themselves without additional cost to the estate.

68. **Motion to Utilize Cash Collateral**

a. At the time of filing, Debtors' cash and cash equivalents are purportedly encumbered by various entities through UCC-1 filings by certain MCAs.[5]

b. At the time of filing, Debtors' cash and cash equivalents are approximately $900,000.00. As such, Debtor has no unencumbered cash.

c. It is absolutely essential for Debtors' short and long-term ongoing operations to be able to utilize cash on hand and collected receivables in order to maintain post-petition obligations, including payroll, insurance payments, licenses, utilities, vendors, and operating costs/overhead.

d. Without access to this cash, Debtors cannot survive.

e. As such, equity dictates that Debtors be able to utilize cash collateral to cover necessary and reasonable ongoing expenses, certain pre-petition prioritized expenses, and that the adequate protection proposed and articulated by Debtors in their motion to use cash collateral, is sufficient to protect the interests of Debtor's Creditors.

f. Debtors propose adequate protection payments, more thoroughly described in the

[5] Debtors challenge the legitimacy of these MCA liens; however, recognize same as duly filed with New York State.

Motion to flow to the Subchapter V trustee in order to preserve these assets for the benefit of the estate while contemporaneously providing security for the purported secured creditors

69. **Motion to Maintain Existing Payroll Service and Pay Prepetition Wage Claims**

a. In the ordinary course of business, Debtors employ approximately 140 (140) employees, including myself, compensated at mixed rates of hourly and salary.

b. The Debtors pay their employees one week in arrears. For example, the last paycheck issued by Debtors on November 13, 2026 to their employees covered a wage period ending November 5, 2026.

c. As such, as of the time of filing, Debtors owe their employees for wages earned from November 6, 2026 through November 20, 2026.

d. Payroll is required to be funded to Debtors' payroll provider by the Wednesday prior to the pay date. As this week is a holiday week, in order to avoid payroll disruption, Debtors would hope to be able to fund its payroll provider by close of business Tuesday, November 24, 2026.

e. Debtors' workforces are critical for the survival of its current ongoing operations.

f. Debtors' employees are loyal and hardworking and it is critical Debtors be granted the ability to pay them for their modest pre-petition services.

g. Upon information and belief, no employee is owed more than the prioritized wage limit.

70. **Motion to Pay Critical Vendors**

a. Debtors seek authorization to pay certain Critical Vendors owed pre-petition amounts

owed.

b. Namely, Debtors owes certain Movie Studios at the outset of this case and, should Debtors not be able to satisfy these obligations, they face a real irreparable harm that could force Debtors to cease operations. The Movie Studios Debtors need immediate authorization to pay, and the justification behind it, is as follows

a. Universal Studios: Debtor owes Universal Studios and Focus Features (a subdivision of Universal) approximately $199,000.00 as of the date of filing. Universal Studios is one of the largest Movie Studios in America and Debtors' ability to screen *Focker-in-Law* (which opens Thanksgiving weekend); *Violent Night 2* (opening December 4, 2026); *Elsinore* and the re-release of *The Odyssey* (December 11, 2026) is contingent on Debtors' ability to pay Universal licensing fees owed. *Focker-in-Law* is anticipated to be one of the largest holiday season releases and Debtors' screening of same will generate significant revenues in the opening, critical stages of these bankruptcies. Universal must be paid by Wednesday, November 25, 2026, in order to screen *Focker-in-Law* timely. It will also put Debtors in a position to screen *Violent Night 2*, *Elisinore*, and *The Odyssey* during the cinema industry's busiest season between Thanksgiving and New Year's.

b. A24: Debtor owes A24 Studios approximately $67,500.00 associated with royalties owed from *You Can See Everything*, one of the largest films of the Fall 2026 movie season. A24 has upcoming releases, including *Club Kid* and *The Debut*. A24 must be paid by Tuesday, November 24, 2026 in order for Debtors to have access to *Club Kid*.

c. Sony: Debtor owes Sony $216,266.36 as of the date of filing. Sony's largest holiday premier is *Jumanji: Open World* which debuts on Christmas. Sony requires payment of these monies by approximately December 18, 2026, in order to screen *Jumanji: Open World*. *Jumanji* is anticipated to be one of the largest openings this holiday season.

c. The reason for the large amounts owed to both Sony and Universal is due to the fallout caused by DCG consolidated payment plan. When DCG "fired" Debtors, they immediately contacted the various MCAs, who then commenced various levies, thus tying up Debtors various accounts and leaving Debtors' unable to pay Sony and Universal for their summer blockbusters *Spider-Man: Brand New Day* and *The Odyssey*.

d. Debtors also maintain critical relationships with certain food and concession vendors, and, should Debtors not be able to satisfy these obligations, they face a real irreparable harm that could force Debtors to cease operations. The food and concession vendors Debtors need immediate authorization to pay, and the justification behind it, is as follows:

a. Coca Cola: Debtor owes Coca Cola approximately $46,418.00 as of the date of filing. Coca Cola supplies Debtors with all of their soda products, including syrups and cups. Additionally, Debtors' ongoing relationship with Coca Cola earns Debtors significant rebates that come back to the Debtors in cash paid out on a quarterly basis. On average, Debtors realize approximately $25,000.00 in rebates annually from its ongoing relationship with Coca Cola and the sale of Coca Cola's products.

b. Vistar: Debtor owes Vistar approximately $133,000.00 as of the date of filing. Vistar supplies Debtors with a multitude of necessary items including popcorn, oil, janitorial supplies, paper goods, ice cream, and other food products. While Vistar does not provide unique goods and services, the negotiated contracts Debtors' have with Vistar are extremely advantageous in terms of pricing, delivery cycles, and access to such a broad variety of goods under one aegis. Should Debtors be forced to immediately find alternative suppliers, it is, without question, anticipated that costs for sourcing these items would increase dramatically. Debtors seek authorization to pay some, but not necessarily all, of Vistar's past due amounts, contingent upon Vistar continuing to supply Debtor based on pre-petition agreed trade terms.

c. Driscoll Foods: Debtor owes Driscoll Foods approximately $16,000.00 as of the date of filing. Driscoll supplies Debtors with its "cooked" foods, including chicken tenders, French fries, mozzarella sticks, cooking oil, and popcorn butter. While Debtors can source these supplies from other suppliers, Driscoll is the most cost-effective supply available and also provides delivery. Without Debtors' ongoing relationship with Driscoll, Debtors' would incur additional expenses from: (a) increased manpower necessary to procure and deliver these supplies, (b) increased pricing for said supplies; and (c) potential delay in receiving said supplies timely.

d. The ICEE Company: Debtor owes ICEE approximately $$27,500.00 as of the date of filing. ICEE supplies Debtors with frozen carbonated beverage syrup, cups, lids, and straws. There is no competitor in the market for frozen

carbonated beverages and they are, historically, a popular good (even in the winter) sold by Debtors at their concessions. It is absolutely critical that Debtors be able to continue to market and sell ICEE drinks at its concessions given the lack of competition in the market and the uniqueness of the product.

e. Gordon Food Service: Debtors owes Gordon approximately $1,400.00 as of the date of filing. Gordon is Debtors' primary food vendor for its Buffalo location, delivering such local favorites as "pizza logs." Driscoll does not operate in the Buffalo market and given the modest amount owed by Debtors to Gordon, maintaining this relationship at this critical stage of the bankruptcy process will help avoid disruption in the ongoing operations of the Buffalo theater.

e. Debtors also maintain critical relationships with the following management vendors:

a. Payroll Dynamics, Inc.: Debtors owes Payroll Dynamics approximately $400,000.00 as of the date of filing. Payroll Dynamics has funded approximately three prior payroll cycles of the Debtors in good faith. While Debtors recognize that they will not have the cash to pay Payroll Dynamics in full immediately at filing, Debtors also recognize that Payroll Dynamics will be likely entitled to prioritized treatment under the bankruptcy code and have been providing payroll services to Debtors since Debtors' inception. Debtors seek authorization to begin paying modest amounts back to Payroll Dynamics on their pre-petition prioritized amounts owed.

71. **Motion to Consolidate and Jointly Administer Cases**

a. At the time of filings, Debtors represent a principal LLC, Scene One, and nine (9) subsidiaries representing individual operating theaters (BTC Schenectady, Gilford, Greeneville, Market Arcade, New Canaan, Spectrum, and Wilton), and an outdoor amusement park (Parks).

b. For the judicial efficiency of these Chapter 11 proceeds, and in keeping with the flow of revenue and business operations, it would be in the best interest of the Debtors, Court, and creditors to consolidate all separate Chapter 11 proceedings under the case administration of the principal alone.

c. While Scene One's subsidiaries operate independent locations, the ongoing business practice of Debtors is to "sweep" subsidiary operating accounts, return the money to Scene One, by which Scene One then pays for ongoing operational expenses of the Debtors, including payroll, utilities, rents, etc.

d. Substantively consolidating these cases would allow for a more streamlined approach to financial disclosures, including Debtors' monthly operating reports.

e. Additionally, Debtors share a consolidated creditor body as the Debtors are all co-debtors of the MCAs. Additionally, Scene One is the "master" Debtor for the purposes of vendor Debts of the Debtors (i.e. studios, concession suppliers, etc.).

f. Should the cases not be substantively consolidated for the life of these cases under Scene One, it would still be judicially efficient and reasonable to continue the Proceedings pursuant to joint administration of the cases with Scene One serving as the primary docket of operation.

g. The entering of an Order to either substantively consolidate or jointly administer the Debtors would save time and money for creditors, the Trustee, and the Court as it

would avoid duplicative, and potentially confusing, filings.

h. As such, in the pursuit of simplicity., cost savings, and organization, the debtors should be either substantively consolidated or jointly administered under the Scene One docket.

72. **Motion to Waive Separate Creditor Lists**

a. As stated above, Debtors represent a principal LLC, Scene One, 9 subsidiaries.

b. Pursuant to joint administration, all matters of the docket and proceeding would be conducted against a single, general docket number which would serve notices, organize filings, and administer any subsequent litigation.

c. As such, there would be no purpose served by severing all creditors across distinct docket numbers which would not serve as the nexus in the activity of the case.

d. The Debtors believe that it would be in the their, the creditors, and the Court's interests to consolidate all creditor identification, noticing, and claims under a single, consolidated matrix in lieu of submitting multiple matrices which would serve only to confuse and frustrate the creditors and proceedings.

73. **Motion Extending the Time to File Schedules of Assets and Liabilities**

a. The Debtors herein, through the operation of multiple theaters in distinct locations, require numerous contracts, licenses, utilities, and other executory contracts to operate in the daily course of business.

b. Altogether, the Debtors' case represents an excess of over two hundred (200) unique creditors which must be listed, noticed, and identified in any Chapter 11 Plan of Reorganization.

c. Due to the sheer volume of creditors and the administrative time and efforts required to ensure that any potential creditor is not left unlisted, which could prejudice its interests, more time is required in order to generate such schedules.

d. Therefore, in the pursuit of equity and in the best interests of the creditors, Debtors seek to ave the deadline to file schedules extended.

74. **Motion to Establish Procedures to Reject Executory Contracts**

a. Debtors intend on maintaining their locations and current contracts as an ongoing concern.

b. However, should Debtors, in their business judgment, determine that some of their locations and/or business relationships (i.e. studio agreements, vendor contracts, etc.) are no longer financially viable, Debtors believe that it is in the best interest of the Bankruptcy Estate to establish streamline and consolidated procedures for Debtors to reject contracts and leases, as necessary.

75. **Motion for Turnover**

a. At the time of filing, Debtors have approximately $900,000.00 in revenues frozen through various UCC Lien enforcement actions taken by the MCA creditors, including:

a. Bank Accounts: Approximately $100,000.00 in cash and cash equivalents are currently frozen at Debtors' TD Bank Account.

b. Vendor Rebates and Amounts Owed: Debtors' various vendors, including Coca Cola and Screen Vision (screen advertising revenue), have received UCC enforcement liens that are delaying the processing of vendor rebates

owed to Debtor.

c. Merchant Payment Processors: Approximately $750,000+ in ticketing fees are currently frozen due to UCC enforcement liens received by Debtors' various payment processors, including Versant (ticket sales through Fandango/Indy), WorldPay (credit card processor payments), and Atom (ticket sales).

b. At the time of filing, Debtors are in a cash crunch due to these freezes on these various accounts.

c. It is absolutely essential that Debtors have immediate access to these amounts and that the Court order turnover to the Debtor by these various custodians of Debtors' cash in order to fund ongoing operations.

76. **Motion to Shorten Time**

a. Pursuant to their Application to Shorten Time, the Debtors seek an order allowing their First Day Motions to be heard on shortened notice.

b. A shortened notice period is essential to maintaining the viability of the Debtors' business given the ongoing business obligations it has including: cash collateral, banking practice considerations, critical vendors, joint administration, schedule deadlines, and to establish an 1111(b) deadline.

77. **Application to Employ Boyle Legal, LLC**

a. Debtors desire to employ Boyle Legal, LLC to represent their interests in these Proceedings.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Dated: November 22, 2026

/s/Joseph Masher
Joseph Masher, Managing Member
Scene One Entertainment, LLC f/k/a Bow Tie Management, LLC
BTC Schenectady, LLC
Scene One Entertainment Parks, LLC
Scene One Gilford, LLC
Scene One Greenville, LLC
Scene One Market Arcade, LLC d/b/a Scene One Market Arcade Cinemas
Scene One New Canaan, LLC
Scene One Spectrum, LLC
Scene One Wilton, LLC
*Debtors and Debtors-in-Possession*

# EXHIBIT A: 13-Week Cashflow Budget

## Scene One Entertainment Consolidated Budget Starting November 20, 2026

*13-Week Cash Flow · Friday Nov 20, 2026 – Thursday Feb 18, 2027 (weeks run Fri –Thu, film-week basis)*

| Week | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week beginning (Fri)** | Nov 20 | Nov 27 | Dec 4 | Dec 11 | Dec 18 | Dec 25 | Jan 1 | Jan 8 | Jan 15 | Jan 22 | Jan 29 | Feb 5 | Feb 12 | |
| **Week ending (Thu)** | Nov 26 | Dec 3 | Dec 10 | Dec 17 | Dec 24 | Dec 31 | Jan 7 | Jan 14 | Jan 21 | Jan 28 | Feb 4 | Feb 11 | Feb 18 | |
| Days in Nov | 7 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| Days in Dec | 0 | 3 | 7 | 7 | 7 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| Days in Jan | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 7 | 7 | 3 | 0 | 0 | 31 |
| Days in Feb | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 7 | 7 | 18 |
| Payroll week (1 = payday) | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 7 |
| **Key Operating Metrics** | | | | | | | | | | | | | | |
| Attendance | 5,962 | 4,869 | 3,412 | 3,412 | 3,412 | 3,412 | 2,376 | 2,376 | 2,376 | 2,376 | 2,238 | 2,134 | 2,134 | **40,489** |
| Average Ticket Price | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | $11.42 | **$11.42** |
| Concessions per Capita | $6.22 | $6.22 | $6.22 | $6.22 | $6.22 | $6.22 | $5.84 | $5.84 | $5.84 | $5.84 | $5.84 | $5.84 | $5.84 | **$6.07** |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Box Office Revenue | $68,081 | $55,603 | $38,964 | $38,964 | $38,964 | $38,964 | $27,136 | $27,136 | $27,136 | $27,136 | $25,556 | $24,370 | $24,370 | **$462,380** |
| Concession Revenue | $37,081 | $30,284 | $21,222 | $21,222 | $21,222 | $21,222 | $13,877 | $13,877 | $13,877 | $13,877 | $13,069 | $12,463 | $12,463 | **$245,755** |
| Advertising Revenue | $1,669 | $1,363 | $955 | $955 | $955 | $955 | $665 | $665 | $665 | $665 | $627 | $598 | $598 | **$11,337** |
| Insider Transaction Repayment | | | | | | | | | $650,000 | | | | | |
| **Total Receipts** | **$106,832** | **$87,250** | **$61,142** | **$61,142** | **$61,142** | **$61,142** | **$41,678** | **$41,678** | **$691,678** | **$41,678** | **$39,251** | **$37,430** | **$37,430** | **$1,369,472** |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| Film Rental | $38,466 | $31,415 | $22,015 | $22,015 | $22,015 | $22,015 | $15,332 | $15,332 | $15,332 | $15,332 | $14,439 | $13,769 | $13,769 | **$261,245** |
| Concessions COS | $8,899 | $7,268 | $5,093 | $5,093 | $5,093 | $5,093 | $3,330 | $3,330 | $3,330 | $3,330 | $3,136 | $2,991 | $2,991 | **$58,981** |
| **Total COGS** | **$47,365** | **$38,684** | **$27,108** | **$27,108** | **$27,108** | **$27,108** | **$18,662** | **$18,662** | **$18,662** | **$18,662** | **$17,575** | **$16,760** | **$16,760** | **$320,226** |
| **Gross Profit** | **$59,466** | **$48,567** | **$34,034** | **$34,034** | **$34,034** | **$34,034** | **$23,016** | **$23,016** | **$673,016** | **$23,016** | **$21,675** | **$20,670** | **$20,670** | **$1,049,246** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Advertising | $1,213 | $1,196 | $1,174 | $1,174 | $1,174 | $1,174 | $1,174 | $1,174 | $1,174 | $1,174 | $1,196 | $1,213 | $1,213 | **$15,425** |
| Salaries & Wages w/Taxes/Benefits | $71,248 | - | $69,607 | - | $68,950 | - | $68,950 | - | $68,950 | - | $69,607 | - | $71,248 | **$488,561** |
| Repairs & Maintenance | $4,551 | $4,488 | $4,404 | $4,404 | $4,404 | $4,404 | $4,404 | $4,404 | $4,404 | $4,404 | $4,488 | $4,551 | $4,551 | **$57,862** |
| Cleaning Services & Theatre Supplies | $1,386 | $1,584 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | $1,848 | **$23,302** |
| Taxes & Legal Fees | $2,525 | $1,833 | $911 | $911 | $911 | $911 | $911 | $911 | $911 | $911 | $965 | $1,006 | $1,006 | **$14,624** |
| Security Alarms & Monitoring | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | $46 | **$599** |
| Data & Telephone | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | $771 | **$10,027** |
| IT Services | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | $579 | **$7,533** |
| Utilities | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | $6,809 | **$88,513** |
| Insurance | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | $2,514 | **$32,678** |
| Travel & Entertainment | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | **$4,548** |
| Licenses & Bank Fees & Dues | $2,135 | $1,744 | $1,222 | $1,222 | $1,222 | $1,222 | $833 | $833 | $833 | $833 | $784 | $748 | $748 | **$14,375** |
| **Total Operating Disbursements** | **$94,128** | **$21,915** | **$90,235** | **$20,628** | **$89,578** | **$20,628** | **$89,189** | **$20,239** | **$89,189** | **$20,239** | **$89,958** | **$20,435** | **$91,684** | **$758,047** |
| **Cash Flow Before Occupancy** | **($34,662)** | **$26,652** | **($56,201)** | **$13,405** | **($55,545)** | **$13,405** | **($66,174)** | **$2,777** | **$583,826** | **$2,777** | **($68,283)** | **$235** | **($71,014)** | **$291,199** |
| **Occupancy (paid first calendar week of each month)** | | | | | | | | | | | | | | |
| Rent & CAM | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $8,755 | $3,752 | $8,755 | $8,755 | **$108,818** |
| Property Taxes | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | $987 | **$12,826** |
| **Total Occupancy** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$9,742** | **$4,739** | **$9,742** | **$9,742** | **$121,644** |
| **Theater Cash Flow** | **($44,404)** | **$16,910** | **($65,944)** | **$3,663** | **($65,287)** | **$3,663** | **($75,916)** | **($6,966)** | **$574,084** | **($6,966)** | **($73,022)** | **($9,507)** | **($80,756)** | **$169,555** |
| **Corporate** | | | | | | | | | | | | | | |
| G&A Allocation | $13,809 | $11,346 | $8,061 | $8,061 | $8,061 | $8,061 | $8,061 | $8,061 | $8,061 | $8,061 | $8,255 | $8,400 | $8,400 | **$114,700** |
| **Cash Flow (EBITDA)** | **($58,213)** | **$5,564** | **($74,005)** | **($4,398)** | **($73,348)** | **($4,398)** | **($83,977)** | **($15,027)** | **$566,023** | **($15,027)** | **($81,277)** | **($17,907)** | **($89,156)** | **$54,855** |
| **Debt Service** | | | | | | | | | | | | | | |
| Debt Service | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | **$75,833** |
| Debt Service — FF&E | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Total Debt Service** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$5,833** | **$75,833** |
| **Operating Free Cash Flow** | **($64,046)** | **($269)** | **($79,838)** | **($10,231)** | **($79,182)** | **($10,231)** | **($89,810)** | **($20,860)** | **$560,190** | **($20,860)** | **($87,110)** | **($23,741)** | **($94,989)** | **($20,978)** |

| Week | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week beginning (Fri)** | Nov 20 | Nov 27 | Dec 4 | Dec 11 | Dec 18 | Dec 25 | Jan 1 | Jan 8 | Jan 15 | Jan 22 | Jan 29 | Feb 5 | Feb 12 | |
| **Week ending (Thu)** | Nov 26 | Dec 3 | Dec 10 | Dec 17 | Dec 24 | Dec 31 | Jan 7 | Jan 14 | Jan 21 | Jan 28 | Feb 4 | Feb 11 | Feb 18 | |
| **NET CASH FLOW** | **($64,046)** | **($269)** | **($79,838)** | **($10,231)** | **($79,182)** | **($10,231)** | **($89,810)** | **($20,860)** | **$560,190** | **($20,860)** | **($87,110)** | **($23,741)** | **($94,989)** | **($20,978)** |
| | | | | | | | | | | | | | | |
| **Cash Position** | | | | | | | | | | | | | | |
| Beginning Cash | $850,000 | $785,954 | $785,685 | $705,847 | $695,615 | $616,434 | $606,202 | $516,392 | $495,532 | $1,055,721 | $1,034,861 | $947,751 | $924,011 | **$850,000** |
| Net Cash Flow | ($64,046) | ($269) | ($79,838) | ($10,231) | ($79,182) | ($10,231) | ($89,810) | ($20,860) | $560,190 | ($20,860) | ($87,110) | ($23,741) | ($94,989) | **($20,978)** |
| **Ending Cash** | **$785,954** | **$785,685** | **$705,847** | **$695,615** | **$616,434** | **$606,202** | **$516,392** | **$495,532** | **$1,055,721** | **$1,034,861** | **$947,751** | **$924,011** | **$829,022** | **$829,022** |
| *Cumulative Net Cash Flow* | *($64,046)* | *($64,315)* | *($144,153)* | *($154,385)* | *($233,566)* | *($243,798)* | *($333,608)* | *($354,468)* | *$205,721* | *$184,861* | *$97,751* | *$74,011* | *($20,978)* | |

*Note: we estimate approx. $150K to be transferred from TD Bank account levies back to our accounts and $700K to be released from Credit Card processing and vendors once those levies are released.* $650,000